Good morning, Your Honor. My name is John Thomas Poore. I am representing Mr. Gant. I would ask that I have five minutes in rebuttal. It may be impossible in this case because there are eight issues and I will speak as quickly as I can. The first issue I'd like to bring to the Court's attention is the exclusion of witnesses by the Court. The Court's exclusion of witnesses was based upon a letter, disclosure letter, with the prosecution. There was no violation of any rule or statute. The disclosure letter itself is common in the District of for the government to facilitate disclosure. In this case, that disclosure went awry for several reasons, and the evidence was destroyed prior to the defense being able to examine it. The government was aware of the witnesses that I proposed on the day of trial. The legal standard is was my conduct willful and motivated by a desire to gain a tactical advantage. The Court never made these findings on the record. The government's argument is that the cases he presents deal with a violation of a rule or statute. In this case, there was no rule or statute violated. I feel that the narrow view of the Court in this case is not warranted and that the witnesses should not be excluded. Well, let me ask you this. If we get to, you know, obviously exclusion of witnesses is, you know, it's at the far end of the spectrum when you feel that someone has violated. And it does appear that there was a violation here. The question was, I think, you were trial counsel, correct? That's correct, Your Honor. Your claim was that you thought they were rebuttal witnesses and that you didn't have to disclose them. But when we get to the, there is a, I can't find anything in the record where you tell me, you say, well, they would have testified as to what they saw at the relay. Well, the agent testified about what happened at the relay where you would be able to show prejudice would be in the record if you said that they would say something different than he would say. But there isn't any offer of proof there. It almost seems like you maybe hadn't even talked to them. And because the significant offer of proof would be that the officer was going to testify to this and that they would testify, say they would say that there was only this much dope or something like that, as opposed to he's describing a fairly, you know, large amount. But you don't make any of that. So it's hard to see what the prejudice would be. Why wouldn't it just be cumulative? Actually the focus at that time was that the defense did not get to examine the evidence. So the witnesses would have testified to the procedures in the attempt to get the relay. But you still have to, if you're going to show prejudice, you still have to articulate some way that that would be any different and not be cumulative of what the agent had testified to. And I don't see that anywhere in the record. I'm trying to recall what the agent ended up testifying to. He testified, a lot of his testimony was I don't know what happened. And my witnesses perhaps could at least tell our side of the story. And that was important in this case. Because there were a lot of questions regarding the part why they were important relative to what was being presented. I mean, I can't tell from here why they were. It's just very generic is that they would have testified as to what they saw. And they also would have testified as to the contacts they had with me as far as setting up the reways and the cancellation of them for various reasons. That an effort was made to do the reway. And the evidence was destroyed by the government before it was successful. The reway was successful. Well, okay. If I give you the benefit of the doubt there that you say that there is some indication that this sort of behavior has to be willful or something along those lines. I noticed that in terms of if you want to say if someone's sandbagging or what their you know, I mean, that's the whole point. If you hold out at the last minute, then people can't be prepared. I mean, we all know when we've had trials and we, you know, get that surprise. I mean, back in the day when I was trying cases, there wasn't even reciprocal discovery. So, you know, I sat chewing my nails during the entire trial what someone else was going to do. But here I noticed that if you want evidence of possible sandbagging, I noticed something that you sat on the whole time was the name of that person. There was someone else's name on the evidence, the piece of evidence. That's one of the other issues. Or someone or something like that. One of the other issues. Well, you're saying that the court couldn't have felt that you were sandbagging him. You know, the court said that you should have known that these weren't, that what the issues were. The court was saying, I don't think the court believed you, to be honest. And but you did another thing in the trial. In closing argument, you argued for the, you say something on one of the sheets of the evidence. There was another defendant's name on there that the prosecutor hadn't even mentioned. And you said, and the prosecutor can't tell you anything about this. Look, this is the wrong, this belongs to another case. It doesn't even belong to this case. And the prosecutor can't say anything about it. So, you know, I can see in here that you were pretty careful to hold your cards close to your, you know, and I don't know, you know, did you really just think they were rebuttal or did you just really hold out to the last minute and hope that that would work out? We had had a discussion the day before, like a pretrial hearing with the judge, and this issue was discussed about how the evidence about the reway and the failure of the reway would be brought in. The agent was kind of vague on what he could testify to and couldn't testify to because there was another agent became involved at one point for the reway. So he wasn't able to give a full explanation. The government brought in another agent the next day to fill in that gap. But at that point, I didn't know they were bringing in that agent. So I was just going with the straight facts from my investigators. The first investigator never did go to the reway. The second one did. The next point I'd like to make is that the court failed to bring in another agent and failed to give the requested theory of the case instruction, which was mere presence. The instruction was, in fact, refused right up front before any evidence was even taken. The instruction must be given if the law, in fact, supported it. The government argues that other instructions cover it, but there are separate instructions for different notions. 6.9 is a mere presence, and the government argues that 3.11 was given. We feel the facts supported the mere presence instruction and that it should have been given. And the ---- How did the facts support a mere presence instruction? That Mr. Gant went to the scene to commit another crime, and all of a sudden another one was sprung on him. So as to the new crime, he was just merely present when this new thing happened. He wasn't ---- he didn't plan it. He didn't ---- he didn't foresee it. He didn't have any knowledge of it. And then he was there, and it was dropped on him. So he was just merely present as to that aspect of the case. Who was driving? He was driving the car. But it was taken from them for a short period of time when the marijuana was loaded in the car and then brought back to him. So he didn't see it being loaded. He went down with one intent. It was loaded, and then they took off in a hurry. Where was it? Somewhere near Sells? Pardon me? Where did this take place? Somewhere near Sells? Was it ---- Near Sells, but out on the reservation. The little villages here and there, and there's a couple of houses, and that's where they went to, to one of these little gathering of houses. And it's just ---- How far from the border? From the border, it's probably 30 miles at that point from the border. The next issue I'd like to bring up is that the court asks all attorneys for preliminary jury instructions that are to be given at the end of the case. For some reason or another, the judge took one that I asked for the end of the case and read it to the jury at the beginning of the case. In it, I set forth what I believe to be the elements of the offense of possession and conspiracy to possess, and in it was my understanding at that time that weight was an element because it determined the sentencing differences. There was a lot of ---- the courts were tossing this idea around quite a bit at that point, and so that was ---- Well, you're correct in that if it's the sentence is going to be enhanced, that it needed to be tried to the jury, which it was in this situation. But it's not in ---- it's an enhancement as opposed to an element of the underlying offense. It was my belief that that's the courts were moving in that direction, and I was just trying to ---- Well, it would have been good for you if the court would have instructed that way, because that's like a silver bullet for you, because if they would have found that there was less than the amount, even though he was transporting, that he could have gotten a not guilty. But unfortunately, that's just not the law. But the court did instruct that at first. He used my instruction. The government did not object to my instruction. And then later on, there was an objection to it, and the court sustained it and says, I'm going to ---- I'm going to give them closing instructions that aren't the same. Well, so are you arguing for the proposition if a judge makes a mistake early in the trial that ---- and learns that, that the judge can't correct it before the jury goes down? No, no, no. No, absolutely not. That's not the law. He can correct it. But then he told me, you can't, Mr. Poore, you can't explain this to the jury. But, Mr. Prosecutor, you can say what Mr. Poore said was not correct. And so I was limited in my argument at that point. The next point you touched upon briefly was the newly discovered evidence motion for a new trial. The ---- we received disclosure, and it had the name of another person on it. But this was a conspiracy, so we're not really aware of who's in the conspiracy. We actually had no way to know that. We asked ---- I made motions for an informant or perhaps an informant was involved whose name was put on there. I requested the agent's notes. Perhaps there was information in his notes that clarified who this person was. None of that was forthcoming. I figured, well, at the trial, I tried to find out something about this, Mr. Ramirez, and I wasn't able to by looking in court records and that sort of thing at the ---- before the trial. And I had no other discovery device to use. So I got to trial, and I figured the government would point out what ---- who that was, and they never did, so I brought it up on closing. The ---- what I did find out, I did find out afterwards that this was ---- that Mr. Ramirez was a real person, which I figured he was. He was placed on a report. And he had been arrested on the same street as Mr. Gann approximately two weeks before, three weeks, two to three weeks before, with 274 pounds of marijuana instead of 272, and the same agent processed him. He came with the same prosecutor and the same judge. So everybody ---- but it was ---- but he pled, and he went away quickly. The ---- so as far as we were concerned, that was newly discovered evidence. Due diligence, we tried to look in the records and the files, all that we could, made the motions that I mentioned. It's certainly material if the evidence brought to court was somebody else's evidence, I believe. It was not cumulative of anything if it's someone else's evidence. That's where ---- that's a new factor altogether. It doesn't accumulate upon anything before it. And if the matter were to go to trial again, it certainly ---- I think the jury would reverse if they found out that the government was using someone else's evidence. In ---- there's a sentencing factor involved here, the obstruction of justice and the sort ---- and Mr. Gann, when he testified, he testified that when he got in the vehicle after it had been brought back after loading, that it had an odor, and he was asked what the odor was, and he said it smelled like stinky feet. This is his opinion of the odor. It's not a fact. He's not stating a fact that it was stinky feet. He just said it smelled like stinky feet. Well, let me ask you this. If ---- can ---- on obstruction of justice, for raising it two levels for that, if the If he makes all the findings, and I don't believe he made a finding on materiality, how that was material to anything in the case. Well, let me ask ---- one thing that I noticed about the evidence, and I think this is problematic for your client, is that the agent testifies as to certain admissions that your client makes to him right, you know, at the ---- before there's any lawyers involved and, you know, when he's arrested. Your client denies those, saying that he said that, and then your client ---- then he comes up with the stinky feet defense, as it were, and that is ---- goes to what the odor was, all right? And the odor goes to whether you knew it was marijuana, right? Yes. And so it would seem to me that with all the different things that your client said to the agent, then he, all of that, that they can't all be true. One of them is a lie. And so based on that, that's the problem. He doesn't stick with the same story the whole time. It's tough when a judge says someone's lying because they refuse to admit they're guilty, all right? You know, they have a right, if they think they're innocent and they want to say that. But your client, unfortunately, gets stuck with saying different things at different times. And so it would seem to me that, you know, he has to be lying somewhere. But as far as the stinky feet goes and the unwashed person goes, that was related to his previous involvement in a run of illegal aliens with the co-defendant on a prior date. And the odor ---- It's obvious because he's saying they thought they were stinky feet because there was a smell and it was either a strong odor of marijuana or it was stinky feet. Okay? He has to, you know, there's a strong odor of something. And so if the court found that to be implausible, which I think the court did, the court just didn't believe that the stinky feet defense, then ---- Well, Mr. Gant had never had any contact with marijuana in the past other than burning marijuana, which smells completely different. So he wasn't ---- So his description may have been correct to what he thought. Well, I think those are good arguments to make for the sentencing. But when the court doesn't buy it, I guess is how can we say the judge was wrong? I just don't see its materiality. Okay. I see my time is up. I will save the rest of the time for rebuttal, Your Honor. Thank you. May it please the Court. My name is Bruce Fergus, assistant United States attorney on behalf of the government in this case. Mr. Gant has raised a total of eight issues. And before addressing any of them specifically, I would just point out that basically what we have here is a situation where Mr. Gant was caught effectively red-handed driving this truck with 250 pounds of marijuana in it. All of the standards, virtually all of the standards of review for all of the eight issues are deferential, either clear error, abuse of discretion, or plain error, either because of the nature of the issue or because they were not fully preserved below. And finally, it's important to note that in denying the defendant's motion for new trial, the district court, after surveying everything and looking at the particular claims that were made, said the evidence here was overwhelming. And so that is the backdrop to all of these kind of miscellaneous claims that are being made. Isn't it pretty harsh, though, to just say witnesses can't testify at all? I mean, that's the ultimate death knell. Well, it no, it's not harsh. First of all, that is the specific. Well, it is harsh, but your response should be probably it's not too harsh. Okay. I'll accept that redrafting. But I'm arguing that it's not too harsh because, first of all, that is the specific sanction that was written into the disclosure agreement, which did not require willfulness. It simply said if you have a potential witness, you have to disclose it to the government at least 14 days before trial or as soon as you know. And he didn't do it. And he's acknowledged that he was aware of these witnesses beforehand and did not do it. And so by the very terms of his contract, which he had benefited from by receiving early disclosure, which he was not entitled to, he had an agreement and he didn't follow through. And so what was the penalty? It was actually written right into the disclosure agreements, of which there were three different ones, all signed, all with representations by Mr. Poore that he had discussed this with the client and that they were fully understanding and in accord with it, that if there was a failure to comply with the terms of the agreement, that exclusion would be the appropriate remedy. But in any event, as you were talking about, Judge Callahan, before, there was no showing of prejudice here. Mr. Poore, in his argument here, has been suggesting that when these witnesses would have come, they would have said something about the whole process of how the marijuana got destroyed. But that's not what he said to the district court. When the district court asked what can these witnesses talk about, first of all, he said, although there are two witnesses, he only explained what one, Murrieta, could speak to. And he simply said that Murrieta would talk about what he saw at the re-way, the one that was eventually done with the sample bale that was maintained. And so there was no suggestion to the district court that this whole history of how the marijuana got destroyed was going to be exposed through these witnesses who had no basis for knowledge. As a matter of fact, it's suggested in the reply brief that somehow the government is at fault here because the trial attorney declined to stipulate to what was going on. That's not true. The government counsel was very willing to stipulate to the entire background as far as it was known, but the bottom line was that it simply was not clear from any of the available agents why the marijuana had been destroyed. And so he balked only at the fact that Mr. Poore insisted that any stipulation or any statement include the fact, leaving it open, that it was somehow the government's fault, rather than that it was simply inadvertent, which is all that the evidence tended to show. So we have no prejudice. We have, in effect, a stipulated penalty for a contractual dispute, and there's no question that they failed to disclose. What is the government's position on why Agent Dralen's notes do not qualify as Brady material? Basically because there's nothing exculpatory or that would have been useful in impeaching Agent Dralen. I provided those notes in camera, as I believe the court's precedents permit, and it's important to recognize that the district court was not unaware. He had those notes physically in front of him, both during a direct examination and the cross, and twice he said, I'm looking at all of this and I'm hearing what you're cross-examining about, and there's simply nothing there. And so the requirement of Brady is, first of all, that the government hide the ball, which it did not do. It turned it over to the district court to make the decision, which fulfilled its responsibility. And secondly, there's no demonstrable prejudice because the district court looked at it and you can look at it. There's simply nothing there that is significantly different or inconsistent. He testified from the notes? In three limited instances, he said, I would have to check that and see if that's in my notes. But there's nothing that I could perceive that was in any way inconsistent or impeaching  And wouldn't it also have to be if there was something exculpatory in the notes that wasn't in the report? That would be a problem for you, right? Right. But your position is there was only, there wasn't any inconsistency, but anything that wasn't integrated into the report was inculpatory as opposed to exculpatory? That's correct. As I could tell from the notes, which if you looked at them are rather fragmentary, the only significant thing that did not actually come out of the trial was the long list of cell phone numbers, which apparently had been gleaned from Mr. Gant's cell phone. And there was never any testimony one way or the other in the case that was not relied on by either side. So it simply wouldn't have made any difference. The second issue that Mr. Port talked about was the fact that there was no mere presence instruction given. This was, again, not a situation where the district court was unknowing or ignorant about what the issues in the case were. It's important to recognize that there was a two-day suppression hearing before a magistrate, which then, upon the objections of Mr. Poore and the defendant, was decided by the district court about the whole issue of the admission of his statements and how that had come about. So the district court was well aware of the basic outline of the case and what the defendant's position was going to be. So when he, at the beginning of the case, basically said, I see no basis for mere presence, it was not an unadvised decision. But even if there were some kind of a problem in making that decision that early, the defense has not shown in any way how their preferred language would have done them any more benefit than what was, I think, three times discussed in the instructions that were given. All of the particular instructions about conspiracy, about aiding and abetting and so forth, made it very clear that you don't convict somebody just on the basis of mere association. There has to be much more than that. And there's been no argument presented to this Court about how what was said was somehow deficient or did not adequately cover the concept of mere presence, so that there's any prejudice from not giving his preferred language. Well, you know, as I heard the argument this morning, this sort of may be a sympathetic argument to the jury, but he didn't his he thought he was going to perform an entirely committed an entirely different crime, as I understand it. He thought he was paying back the debt and he was going to drive some illegals across the border, and then he winds up, because he was there and the car was there, he winds up driving all of this monumental amount of marijuana across the border, which is... Well, that was the claim that he was going to be in trial. Yeah. The reason why this was more than just a mere presence was the fact that he had already made his unfortunate admissions at the time that he was arrested, that, in fact, he was doing this load of marijuana for Cecil Niles. The mere presence goes to the time of arrest, I take it, not to how he got into it in the first place. Yes. Well, that's the other admission that he made is that to Agent Dreeland, though he again disputed that at trial, which was that once they had gotten the truck back and got into it, he and the co-defendant, Eliezer Lea, that he looked over under the blanket and saw the marijuana and realized what it was. So, again, there were the admissions that he had made early on that he contradicted at trial, which created a whole issue of his credibility. Well, what I'm hearing Judge Schroeder say, and I hadn't really thought of it, is that because defendants are entitled to instructions on the theory of their case, but what I was hearing that Judge Schroeder say was that it was her understanding that the theory of his case was, I was committing, the theory of his case wasn't mere presence, the theory of his case was I was committing another crime and not the one I'm charged with. Well, it was kind of a combination of the two. He claimed, in a sense, that he knew he was going to commit a crime, but that it was transportation of illegal aliens, and that, therefore, when it turned out to be marijuana, he was merely present with the marijuana and, therefore, lacked, I suppose, the culpable state of mind or the degree of knowledge that would go to the actual charged crime. But, again, the basic idea is we don't convict you just because you're associated with these 250 pounds of marijuana. You have to find some kind of knowledge and connection, and that was fully explained in both the conspiracy and the substantive instructions. And then we go back to the plain smell problem, this smell as to his knowledge of what it was at the time of the arrest. That was, again, his contention. And as far as whether that was an appropriate basis for the obstruction enhancement, the standard is clear error. This was a factual determination that the district court made after watching the entire trial, watching Mr. Gant testify, and there were some suggestions in the reply brief that maybe this was just a hasty or a casual opinion rather than a statement of fact. But if you actually read the testimony of Mr. Gant, he was very, very careful about what he was saying, to the point, for example, that he disputed with the government counsel about whether his weightlifting was the same as bodybuilding. So this was not a defendant who was willing to be just kind of led along and made to say things. He was very precise about what he wanted to say. And so to say it smelled like stinky feet or sweaty bodies to try and connect it with the prior run where he had run aliens clearly is something that the judge could say, wait a minute, you're trying to create a false picture of what was going on. The denial of the new trial motion with regard to the name of Mr. Ramirez on there, if I was hearing Mr. Poore correctly, he basically admitted that he was aware before trial that there was, in fact, this discrepancy. He has suggested that he took certain steps to investigate why Ramirez's name was on this particular exhibit in Mr. Gant's case, but unfortunately that's not something that was ever put in front of the district court. There's no record of any kind of pretrial diligence. All we have is him saying, yes, I knew that that name was on there because I had all the reports, and basically saying, well, I really couldn't do anything about it until I saw what the government did at trial. Well, what if, though, as he did do, the jury had at the end of the day believed that that was from the wrong case? What would that have done to your case? They would have acquitted him because the issue was very clearly put in front of him. There was testimony, there was cross-examination of Agent Vreeland, and there was this other lady agent, I believe her name was Morales, who had been involved in working out the arrangements to try and set up the re-way, which then fell through because of the funeral of President Reagan and was argued in the closing arguments. Did the district court say anywhere that they thought that it was a strategy that just didn't work out? No, the district court did not make that particular finding. It simply found that the ---- Just that he wasn't diligent? Yes. And also that it was cumulative, again, because the essence of the issue had already been presented to the jury, and they found against him. Those are the issues that were presented to you. We don't have to use all your time. If you have any other questions, I'd be glad to answer them. Questions? Don't appear to be. Thank you. Thank you, Your Honor. I would point out that the ---- Your Honor brought up the idea about the notes, and should they have been disclosed, the information in the notes of Cecil Niles, who was apparently the ringleader, the stated ringleader of this conspiracy, would have been very helpful to the defense to know, especially if he had told the officers that, yes, I smuggle narcotics and I smuggle illegal aliens on the reservation, which apparently he did. I ---- It raises a lot more questions that I can't answer about how did they know he was in narcotics trafficking. That apparently came out, was in the notes. How ---- I went to the records looking for Cecil Niles and couldn't find anything on him. So I don't know, was he an informant?  So any information on Cecil Niles would have been valuable if he had said, oh, I only smuggle marijuana. Of course, I don't know how that would come about. That's an admission. It would be hauled into court and prosecuted. The statement on the mere presence ID and what the case was against Mr. Gant, the one statement that Mr. He got in the vehicle after it had brought back from being loaded, that he moved the blanket. That makes no sense. That makes absolutely no sense. If he knew he was smuggling marijuana, why would he have to look and see what it was? Either way, if he was smuggling aliens, why would he have to look and see what it was? There is no reason. He moved the blanket. When did he test it? The agent says that Mr. Gant told him that he got in the truck and moved the blanket to see what it was. Why would he have to see what it was? He knew what it was. As far as he knew, it was illegal aliens. And these people are tiny people. It's kind of a hard concept, but you don't realize how small these people are when they walk into the courtroom. They're just tiny people. And they get down and they huddle down and they don't talk because they can't speak English. And it's very likely that there could be three or four people in the back of a king cab covered with a blanket, and all you do is smell them. Mr. Ferg stated that I should have staged my investigation with Agent Vreeland while he was on the stand. I don't do that. I don't do my investigation. Thank you very much. Case just argued is submitted for decision. That concludes the Court's calendar for this morning. The Court stands adjourned. All rise. This Court for this session stands adjourned.
judges: Schroeder, Noonan, Callahan